## S05A0839. WOOD v. THE STATE.
### (620 SE2d 348)

MELTON, Justice.

After the death of 72-year-old Mary Ruth Green from severe neglect, Troy Wood, along with his girlfriend Rita Rene Dorlon, was indicted for malice murder, felony murder while committing cruelty to a person 65 years of age or older, and one count of cruelty to an elderly person. A jury found Wood guilty on the felony murder and cruelty counts. He appeals from the denial of his amended motion for new trial.[1] Finding no error, we affirm.

Viewed to support the jury verdict, the evidence shows that Wood lived with the victim's daughter Rita Rene Dorlon and their two children. Wood considered Dorlon his wife and referred to the victim as his "mother-in-law." Wood and Dorlon were unemployed, and the victim's Social Security check constituted their primary source of household income. This income became unavailable to Wood and Dorlon, however, when the nursing home in which the victim was residing began receiving the checks directly. Wood and Dorlon subsequently learned that, in order for them to have control over the checks, they would have to take the victim into their home. Wood and Dorlon discussed the situation, and after Wood agreed to assist in caring for the victim, Wood and Dorlon, in concert, immediately removed the victim from the nursing home despite the fact that she was confined to a bed or a wheelchair, was incontinent, and required insulin injections. Prior to the victim's move, the nursing home staff instructed Wood and Dorlon regarding the victim's complicated care

---

[1] The victim's death occurred on August 30, 2003. Wood and Dorlon were indicted September 11, 2003 in Whitfield County. Dorlon pled guilty before the trial commenced. Wood was found guilty on June 18, 2004 and sentenced that same day to life imprisonment. His motion for new trial, filed July 14, 2004 and amended November 11, 2004, was denied December 10, 2004. The appeal was docketed February 1, 2005 and was orally argued May 10, 2005.

requirements, and Wood took instructions on how to move the victim, as Dorlon would not be strong enough to do so. Because Wood and Dorlon moved the victim into their home, the victim, who did not want to leave the nursing home, was forced to rely upon Dorlon and Wood for her care; however, Wood and Dorlon failed to care for her, allowing her to lay in her bed without moving her until the victim developed serious bed sores and infections, including gangrenous ulcers. Wood, in fact, admitted that, even though he could hear the victim call out in pain or request water, he would ignore her entreaties for assistance. On August 30, 2003, a paramedic found the victim dead in the home. A stench permeated the house, the mattress was badly stained with old feces and urine and soiled bed linens were piled outside the victim's bedroom window. Eyewitnesses testified that they had observed maggots on the bed, and the medical examiner testified that the victim was subjected to numerous cockroach bites. An autopsy report revealed that the victim had died as the result of "severe chronic neglect." The cause of death had many contributing factors, but the medical examiner opined that the precipitating factor was the "great degree of dead and dying tissue and abscesses on the inside of the thighs," due to prolonged contact with urine and feces. Dorlon testified that Wood agreed to assist with the victim's care at the time the couple removed the victim from the nursing home. Wood acknowledged that for the first two months after the victim arrived from the nursing home he would help with her care and performed duties such as taking the victim to the doctor, moving her in and out of the wheelchair, and contacting 911 on her behalf, but he denied having any responsibility for her immediate health care and sustenance. Wood testified that he was aware that Dorlon substituted illegal pain pills for the victim's prescription medication and insulin and acknowledged that he would burn the bed sheets used instead of diapers to control the victim's bladder and bowel functions when they became too fetid.

1. Wood contends that there was insufficient evidence to convict him of felony murder and cruelty to a person 65 years of age or older because he had no duty to care for the victim and the evidence does not support the conclusion that he ever assumed responsibility to provide health care or other necessary services to the victim. Because the evidence would support the jury's conclusion that Wood voluntarily agreed to supervise, have immediate charge of, and have custody of the victim in his home, the statute requires him to care for the victim. Cruelty to a person 65 years of age or older is committed when

> [a] guardian or other person supervising the welfare of or having immediate charge or custody of a person who is 65

years of age or older ... willfully deprives a person who is 65 years of age or older of health care, shelter, or necessary sustenance to the extent that the health or well-being of a person who is 65 years of age or older is jeopardized.

OCGA § 16-5-100 (a). The statute under which Wood was charged was enacted to protect susceptible elderly persons from abusive physical and financial exploitation. See generally 17 Ga. State U.L. Rev. 93 (2000). In furthering this goal, the statute imposes criminal liability upon a person having supervision or "immediate charge or custody" of an elderly person who willfully fails to provide health care and sustenance to the elderly person. In doing so, the statute does not simply encourage care of a dependent elderly person, it mandates adequate care for the dependent elderly.

Although Wood does not take issue with the coroner's finding that the victim died as a result of chronic neglect, he nevertheless contends that the statute is inapplicable because he was not the victim's primary caretaker and therefore could not willfully deprive her of health care and sustenance to place her in jeopardy. The cruelty to elderly persons statute has not been construed, therefore it is instructive to consider cases interpreting the cruelty to children statute, OCGA § 16-5-70 et seq.,[2] for guidance. The cruelty to children statute does not require the perpetrator be limited to a primary care giver inasmuch as a person is considered "in charge or custody" if the person is a regular member of the household. See *Copeland v. State*, 263 Ga. App. 776 (589 SE2d 319) (2003) (concluding that child cruelty statute requiring a person have charge or custody of the child applied to a defendant who had been living with the mother and her children in a family-like situation for over a year). Compare *Johnson v. State*, 269 Ga. 840 (506 SE2d 374) (1998) (evidence insufficient to convict child's uncle of felony murder and cruelty to children where evidence did not exclude the reasonable hypothesis that the crime was entirely unknown to the uncle). The cruelty statute also applies to a wide range of situations, including passive forms of abuse, such as extreme neglect. For example, cruelty can be shown by intentionally and unjustifiably delaying necessary medical attention, *Mikenney v. State*, 277 Ga. 64 (2) (586 SE2d 328) (2003), as that delay may cause cruel and excessive suffering.

Wood was the only other adult member of the household, he received a direct financial benefit by having the victim at his home

---

[2] Subsection (a) of the cruelty to children statute provides that a "parent, guardian, or other person supervising the welfare of or having immediate charge or custody of a child under the age of 18 commits the offense ... when such person willfully deprives the child of necessary sustenance to the extent that the child's health or well-being is jeopardized."

rather that at the facility better suited to take care of her, he participated in the nursing home discharge procedure and was the recipient of instructions about how to move the victim in and out of her wheelchair, and in this case, the victim died because she was never moved out of her bed. Although the evidence is conflicting as to the extent of care Wood agreed to undertake, the evidence is not in dispute that Wood actively participated in the decision to bring the victim into his home, knowing the extent of care that the victim would require and agreeing to assist Dorlon, therefore, voluntarily and knowingly agreeing to place the victim under the supervision of, under the charge of, and in the custody of Dorlon and himself. Because Wood did this, the statute imposed a duty on him to care for the victim. He wholly failed in this duty. Under these circumstances, viewing the evidence in favor of the jury's verdict, we conclude there was sufficient evidence from which a rational trier of fact could find beyond a reasonable doubt that Wood was guilty as the perpetrator or as a party to the crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Consequently, the trial court did not err by denying Wood's motion for a directed verdict of acquittal. *Davis v. State*, 261 Ga. 255 (1) (403 SE2d 813) (1991).

2. Prior to trial, Wood filed a motion in limine seeking to exclude any mention of neglect to his children or violence directed at Dorlon. He contends his character was impermissibly placed in issue when the trial court allowed the State to elicit testimony from the coroner regarding the physical appearance of Wood's children and allowed Dorlon to testify that she stopped asking Wood for assistance with the victim because doing so would lead to an argument. " 'Evidence that is relevant and material to an issue in a case is not made inadmissible because it incidentally places the defendant's character in issue.' [Cit.]" *Fuller v. State*, 278 Ga. 812, 816 (4) (607 SE2d 581) (2005). Here, the condition of the home and its inhabitants as well as Wood's reaction to the request to assist with the victim were relevant to the issue of his culpability for the neglect of the victim that resulted in her death.

3. Wood contends that the trial court erred in allowing the jury to view three photographs that showed the deterioration to a portion of the victim's inner thigh. The pre-autopsy photographs that illustrated the nature and extent of the injuries sustained by the victim due to chronic neglect were admissible. See *Dean v. State*, 273 Ga. 806 (2) (546 SE2d 499) (2001). The fact that the ulcers "oozed" when touched by the medical examiner simply depicts their egregious nature.

*Judgment affirmed. All the Justices concur.*

HUNSTEIN, Presiding Justice, concurring.

I concur with the majority's affirmance of Wood's conviction for the felony murder of Mary Ruth Green based on the underlying felony of cruelty to a person 65 years of age or older under OCGA § 16-5-100 (a). I write separately to make clear that under the express language of the statute, the statutory duty giving rise to Wood's criminal liability arises out of his relationship to Green.

OCGA § 16-5-100 (a) imposes criminal liability upon a "guardian or other person supervising the welfare of or having immediate charge or custody of a person who is 65 years of age or older" when the person willfully deprives such elderly person of "health care, shelter, or necessary sustenance to the extent that the health or well-being of [the elderly person] is jeopardized."[3] In order for criminal liability to arise under the statute, a defendant must stand in a special relationship to the victim such that the defendant is under an existing duty to care for the victim. Specifically, under the express language of the statute, the defendant must either be a person supervising the welfare of or having immediate charge or custody of an elder.

In this case, Wood was charged by indictment with having immediate charge and custody of Green and failing to provide her with health care and necessary sustenance to the extent her health or well-being was jeopardized. Wood argues that he was not a person with charge or custody of Green but merely assisted Dorlon when she needed help moving Green from the bed to a wheelchair. The record in this case demonstrates, however, that Green was a completely dependent, elderly woman living with her daughter, Dorlon, and Wood, Dorlon's long-time boyfriend, in a home owned by Green but in which Dorlon and Wood had lived for many years. Wood and Dorlon brought Green to live with them in order to obtain control of her monthly Social Security checks which constituted the great majority of their household income. At the time Wood and Dorlon removed Green from the nursing home against her wishes, they were informed of Green's special needs and were instructed by nursing home staff on the necessity for and method of moving Green and the preparation of her insulin injections. Both Wood and Dorlon assured nursing home personnel they would care for Green. Wood affirmed his willingness to care for Green when he told Dorlon he would do whatever he could to help care for Green. Thus, Wood and Dorlon agreed between themselves and confirmed to others that they would take responsibility for the custody and care of Green. They in fact took control not only of her physical person, but also over her real property and

---

[3] OCGA § 16-5-100 (a) protects persons 65 years of age and older from neglect. For purposes of brevity, the use of the word "elder" includes the entire protected class.

income. Wood knew Green was dependent upon others to feed, clean, and move her. He had actual knowledge that Green required, but did not receive, medications, medical attention, and food and water; that her person and physical surroundings had become filthy from human waste and debris to the extent that parts of her body were literally decaying from exposure to human waste; and that the mattress from which she could not move without assistance was soaked through with human urine and feces. Nevertheless, Wood took no steps to assist Green. He did not obtain professional help, he did not care for Green while she resided in the home they shared, and he did not discuss with family members the possibility of making different arrangements for her care.

Under these facts, the jury was authorized to find that Wood had immediate charge or custody of Green. Although OCGA § 16-5-100 does not define the terms "immediate charge or custody of," clearly such language was intended to include persons residing with the elder who had been entrusted with the care and custody of the elder either by express agreement or by voluntarily assuming responsibility for such care. As recognized in the majority opinion, courts have similarly interpreted the identical language found in the cruelty to children statute, OCGA § 16-5-70 (a). See *Copeland v. State*, 263 Ga. App. 776 (1) (589 SE2d 319) (2003).

Because Wood was "a person having immediate charge or custody of" the elderly Green, and he willfully deprived her of health care and necessary sustenance resulting in her death, he is criminally liable for the felony of cruelty to an elder person under OCGA § 16-5-100 (a).

I am authorized to state that Justice Benham joins in this concurrence.

DECIDED SEPTEMBER 26, 2005.

*Avrett, Ponder & Barnwell, William B. Barnwell*, for appellant.
*Kermit N. McManus, District Attorney, Thurbert E. Baker, Attorney General, Vonnetta L. Benjamin, Assistant Attorney General*, for appellee.